UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER L. ELLIS,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>CENTRAL REFRIGERATED SERVICES, INC., BILL BAKER, K.C. McCANN, and DOES 1-10, inclusive,<br><br>　　　　Defendants. | **CASE NO. 5:08-cv-01291-JHN-MANx**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Judge: Hon. Jacqueline H. Nguyen** |

## I. INTRODUCTION

On May 31 through June 2, 2011, the Court held a bench trial on the following claims of Plaintiff Walter Ellis: (1) retaliation in violation of 42 U.S.C. § 1981; (2) conspiracy to violate civil rights, 42 U.S.C. § 1985(3); (3) conversion; (4) breach of contract; (5) breach of the covenant of good faith and fair dealing; (6) civil conspiracy; and (7) unlawful business practices, Cal. Bus. & Prof. Code § 17200, *et seq*. Having reviewed the testimony and exhibits

presented at trial, the Court now makes the following findings of fact and conclusions of law.[1]

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction is not in dispute.

2. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2).

## III. FINDINGS OF FACT

1. Plaintiff Walter Ellis is an African-American male.

2. Defendant Central Refrigerated Services, Inc. ("CRS"), is a transportation services provider headquartered in West Valley City, Utah.

3. Defendant Bill Baker ("Baker") is the Director of Human Resources for CRS and has held that position during the entire time of Plaintiff's involvement with CRS.

4. Defendant K.C. McCann is the terminal manager for CRS's facility in Fontana, California.

5. Plaintiff was hired by CRS as an over-the-road truck driver on August 30, 2007.

6. On October 15, 2007, Plaintiff took a medical leave.

7. On November 14, 2007, Plaintiff was re-hired by CRS as a company driver.

8. When he was re-hired, Plaintiff was given a copy of CRS's Driver Manual.

9. On January 4, 2008, Plaintiff voluntarily ended his employment with CRS and became an owner-operator with CRS.

---

[1] To the extent any findings of fact may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent any conclusions as stated may be deemed findings of fact, they shall also be considered findings.

10. The policies of CRS as set forth in the Driver Manual apply to owner-operators. (Trial Ex. 500-3.)

11. The Driver Manual prohibits employees and owner-operators from "[m]aking false, vicious or malicious statements about other employee(s), CRS Owner-Operators, or CRS." (Trial Ex. 500-8.)

12. When he became an owner-operator with CRS, Plaintiff entered into a Contractor Agreement, setting forth the terms of the contract between Plaintiff and CRS. (Trial Ex. 503.)

13. The Contractor Agreement provides that if "any party violates . . . any Company policy, the other party shall have the right to immediately terminate the Agreement." (Trial Ex. 503-12, ¶ 14.)

14. When he became an owner-operator with CRS, Plaintiff entered into an Equipment Leasing Agreement, whereby he leased a 2008 Kenworth T2000 tractor from Central Leasing, Inc., an affiliated company of CRS. (Trial Ex. 505.)

15. The Equipment Leasing Agreement provides that "[l]essee shall be in default under this lease upon the happening of any of the following events or conditions (herein called "Events of Default") . . . (g) if the Operating Lease Agreement between Lessee and the Operating Carrier is terminated by either party for any reason." (Trial Ex. 505 ¶ 12.)

16. The Equipment Leasing Agreement identifies CRS as the Operating Carrier. (Trial Ex. 505-2, ¶ 6.)

17. The Equipment Leasing Agreement provides that "[u]pon the occurrence of an Event of Default, Lessor, at its option, may exercise any one or more of the following remedies: . . . (d) enter upon the premises where any Item of Equipment is located, and without notice to Lessee, and with or without process, take immediate possession of such Item . . . ." (Trial Ex. 505-5, ¶ 13.)

18. When he entered into the Equipment Leasing Agreement, Plaintiff also signed a Limited Power of Attorney ("LPOA") whereby he appointed CRS

as his agent and granted it the right to "conduct . . . certain acts on [his] behalf in the event said lease agreement is terminated." (Trial Ex. 506.)

19. Among the powers granted to CRS under the LPOA was the power to "take possession of, whether by repossession or otherwise, said leased equipment and sell, assign, re-lease, convey, mortgage, hypothecate, lease, or otherwise use or dispose of said equipment . . . ." (Trial Ex. 506-1.)

20. During the course of his relationship with CRS, Plaintiff raised various concerns with CRS administrative personnel, including Baker and CRS's general counsel, Mark Wilkey.

21. In February 2008, Plaintiff met with Baker, Wilkey, and Carl Dicharo, CRS's Director of Operations.

22. During the February 2008 meeting, Baker specifically asked Plaintiff whether Plaintiff felt that he had been discriminated against at CRS, and Plaintiff responded that he never had.

23. The February 2008 meeting, the content of which was memorialized in a letter from Baker to Plaintiff on February 25, 2008, involved Plaintiff's concerns about trainees, safety, and pay-related issues. (Trial Ex. 507.)

24. Plaintiff did not bring complaints of racial discrimination to the attention of CRS administrative personnel during the February 2008 meeting. (Test. of B. Baker, M. Wilkey; Trial Ex. 507.)

25. Thereafter, Plaintiff posted statements critical of CRS on the World Wide Web. (Trial Exs. 511-9, 512-10.)

26. On the Web, Plaintiff falsely claimed that CRS refused to take action against employees Plaintiff reported as being on drugs. (Trial Exs. 511, 512.)

27. Action was indeed taken against these employees but, for privacy reasons, CRS did not inform Plaintiff of what that action was. (Test. of B. Baker.)

28. On the Web, Plaintiff falsely claimed that CRS had issued a commercial driver's license to a trainee though the trainee could not properly shift or steer a truck and should not have been licensed. (Trial Ex. 511-9.)

29. Commercial driver's licenses are issued by the various states and not by CRS. (Test. of B. Baker, M. Wilkey.)

30. On the Web, Plaintiff falsely claimed that CRS fired black people for being honest. (Trial Ex. 511-10.)

31. The statement above refers to a specific driver who was fired by CRS because he violated company policy by using his truck as a personal taxicab and by keeping a dog on the truck. (Test. of B. Baker.)

32. On the Web, Plaintiff falsely claimed that CRS employed inspectors from the U.S. Department of Transportation in its training program, a conflict of interest. (Trial Ex. 511-11.)

33. CRS did not employ Department of Transportation employees in a training program; the training program was conducted by an entity separate from CRS. (Test. of B. Baker.)

34. On March 5, 2008, Wilkey authored a message that was sent to Plaintiff by Baker advising Plaintiff that if the false statements, which were violative of Company policy, were not removed from the Web by 5:00 p.m. on March 7, 2008, CRS would terminate Plaintiff's Contractor Agreement. (Trial Ex. 508.)

35. Although Baker and Wilkey agreed to extend the deadline for Plaintiff to remove the statements from the Web to March 10, 2008, he failed to do so and continued to post materials CRS found objectionable. (Test. of B. Baker; Trial Ex. 512.)

36. On March 10, 2008, CRS terminated the Contractor Agreement as a result of Plaintiff's ongoing posting of false and malicious statements about CRS on the Web. (Test. of B. Baker, M. Wilkey; Trial Ex. 513.)

37. Upon CRS's termination of the Contractor Agreement, Plaintiff was in immediate default of the Equipment Leasing Agreement.

38. On March 10, 2008, CRS, acting under the power afforded it by the LPOA, took possession of the 2008 Kenworth T2000 tractor.

39. During the February 2008 meeting with CRS personnel, Plaintiff stated he did not want to continue as a trainer. (Test. of B. Baker; Trial Ex. 507-3.)

40. Trainees placed with Plaintiff while he was a trainer were unable to complete their training with Plaintiff and had to be reassigned to other trainers, with whom they successfully completed training. (Test. of B. Baker; Trial Ex. 507-2 to 507-3.)

41. Plaintiff did not present any factual evidence that he experienced any change in the loads he was assigned throughout his time with CRS.

42. Plaintiff did not present any factual evidence that he was eligible for any dedicated fleet run.

43. The Court finds credible Baker's testimony that CRS's dedicated fleet runs were managed by a separate division that selected drivers based on a set of criteria including having maintained a long-term relationship as a driver with CRS, which made Plaintiff ineligible for the dedicated freight runs. (Test. of B. Baker.)

44. Plaintiff believes he received unfair treatment, including being terminated, after he filed a complaint with the Department of Transportation.

45. The Department of Transportation investigates trucking safety and operation violations, not violations of anti-discrimination laws. (Test. of M. Wilkey, B. Baker.)

### IV. CONCLUSIONS OF LAW

**A. Federal Claims**

**42 U.S.C. § 1981**

1. Plaintiff's § 1981 claim alleges retaliation in violation of his civil rights. "To establish a prima facie case of retaliation, a plaintiff must prove (1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the two." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1107 (9th Cir. 2008.)

2. On the basis of the evidence presented at trial, the Court concludes Plaintiff did not establish that he engaged in a protected activity. Though Plaintiff argued at trial that he brought complaints of discrimination to CRS, Baker's testimony indicates he was aware of no such complaints. Moreover, Baker testified that when he, Wilkey, Dicharo, and Plaintiff met in February 2008, Baker specifically asked Plaintiff whether Plaintiff felt he had been discriminated against at CRS and Plaintiff responded that he had not. Rather, the February 2008 meeting involved Plaintiff's concerns about trainees, safety, and pay-related issues.

3. The Court finds Baker's testimony credible and corroborated by both Wilkey's testimony and documentary evidence regarding the meeting. (Trial Ex. 507.) On this basis, the Court finds that plaintiff did not bring complaints of racial discrimination to the attention of CRS administrative personnel.

4. Moreover, Plaintiff's testimony indicated that he received unfair treatment after filing a complaint with the Department of Transportation; Defendants established that the Department of Transportation investigates trucking safety and operation violations, not violations of anti-discrimination laws. Such a complaint thus cannot serve as a basis for a claim under § 1981.

5. Furthermore, even if the evidence established that Plaintiff had engaged in a protected activity, Plaintiff presented no credible evidence that such activity was the cause of an adverse employment action by CRS.

6. Plaintiff first asserted that after he made complaints, CRS took away trainees who had been assigned to Plaintiff, reducing his income considerably, and gave him loads that paid less than those he had previously been given.

7

7. Plaintiff's testimony is tantamount to no more than speculation that the decision to reassign trainees was based on his complaints.

8. Defendants, by contrast, presented credible and corroborated evidence that the decision was based on Plaintiff's failures as a trainer and his stated desire not to continue as a trainer.

9. Similarly, Plaintiff presented no factual evidence that he had experienced a change in the loads he was assigned.

10. Additionally, Plaintiff did not establish that the more desirable dedicated fleet runs he claimed were not given to him were ones for which he was eligible, and Baker's testimony indicated that Plaintiff would not have been eligible for these runs.

11. Second, Plaintiff asserted that the termination of his contract was a result of his complaints. However, Defendants' documentary and testimonial evidence establishes that this was not the case.

12. Both Baker and Wilkey testified that the termination was based *solely* on Plaintiff's posting of false statements about CRS on the Web.

13. The Court concludes that in the statements Plaintiff posted on the Web, Plaintiff made false aspersions against CRS without any basis in fact and that CRS had a right to terminate Plaintiff because of these statements.

14. Accordingly, the Court finds in favor of Defendants on this claim.

**42 U.S.C. § 1985(3)**

15. Plaintiff asserts that Defendants conspired to violate his civil rights, as prohibited by § 1985(3.) To prove a violation of § 1985(3), a plaintiff must demonstrate that "invidiously discriminatory animus" underlies the actions of the conspirators. *Orin v. Barclay,* 272 F.3d 1207, 1217 (9th Cir. 2001.) "The conspiracy, in other words, *must aim* at a deprivation of the equal enjoyment of rights secured by the law to all." *Id.*

16. Plaintiff presented no evidence at trial to support a finding of such discriminatory animus and purpose on the part of Defendants.

8

17. Plaintiff's § 1985(3) therefore fails.

**B. State-Law Claims**

**Conversion, Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Unlawful Business Practices Against CRS, and Civil Conspiracy Against Bill Baker**

18. All of Plaintiff's state-law claims rest on assertions that Plaintiff's termination was wrongful and that CRS wrongfully repossessed the Kenworth tractor and failed to reimburse Plaintiff for the amount he had paid for the tractor.

19. Plaintiff's termination was proper, pursuant to the terms of the Contractor Agreement.

20. Plaintiff's posting of the false statements about CRS on the Web violated CRS's policy prohibiting employees and owner-operators from making false, vicious, or malicious statements about CRS, as provided in the Driver Manual. (Tr. Ex. 500.)

21. The Contractor Agreement in turn provided that if a party to the agreement breached the agreement or violated CRS policy, the other party could immediately terminate the Agreement. (Tr. Ex. 503 ¶ 14.)

22. Wilkey and Baker provided a warning and extended the deadline for Plaintiff to cure the violation of CRS's policies.

23. Plaintiff's termination on March 10, 2008, was therefore entirely within CRS's rights and in no form improper or wrongful.

24. The repossession of the tractor was proper, pursuant to the terms of the Equipment Leasing Agreement and Limited Power of Attorney.

25. Plaintiff's termination caused him to be in default of the Equipment Leasing Agreement, allowing the lessor to terminate the lease and take immediate possession of the leased equipment. (Tr. Ex. 505 ¶¶ 12, 13.)

26. Additionally, the Limited Power of Attorney granted CRS the power to repossess the equipment if the lease agreement was terminated. (Tr. Ex. 506 ¶ 1.)

27. As both Plaintiff's termination and the repossession of the tractor occurred pursuant to the terms of the agreements executed by Plaintiff, none of Plaintiff's claims based on the termination or repossession succeed.

28. Accordingly, the Court finds in favor of Defendants on all of Plaintiff's state-law claims.

## V. <u>CONCLUSION</u>

Based on its findings of fact and conclusions of law, the Court concludes that Plaintiff failed to prove any of his federal or state-law claims. Accordingly, Defendants are entitled to have judgment entered in their favor.

Dated: July 22, 2011

_____
HON. JACQUELINE H. NGUYEN
UNITED STATES DISTRICT JUDGE